Good afternoon. We're here for oral argument in Kenneth Eugene Smith v. the U.S. Department Commissioner of the Alabama Department of Corrections, Robert Grass is here for Appellate Smith. Thomas Wilson is here for the Commissioner. And Mr. Grass, you may begin. Good afternoon. May it please the Court? I am Robert Grass. I'm here to complain to Kenneth Smith. In about 28 hours, the Alabama Department of Corrections intends to execute Mr. Smith, even though it subjected condemned inmates to unnecessary guilty and substantial pain in its last two executions. And even though it has done nothing since to investigate what happened, how it happened, or how it can attempt to ensure that it will not recur. What are we to make of the district court's instruction to the Alabama Department of Corrections to strictly adhere to and not deviate from its legal injection protocol during Smith's execution? Your Honor, that is not complete relief for two reasons, in our view. First, the order is that the specific procedures mentioned in the order are cut down procedure and intramuscular sedation. Our claim is broader than that. And there is no agreement on what a deviation from the protocol would consist of. And I will give you an example. For example, Alan Eugene Miller, who the department attempted to execute on September 22nd and who survived the event, has laid out his own firsthand account in his own complaint. Even according to Mr. Miller's allegations, there was no cut down procedure, nor was there any sedation in the attempted execution. Nevertheless, the department personnel poked, prodded, jab, stabbed Mr. Miller for nearly two hours. And the district court found, at least as to Mr. Miller, that would state a plausible allegation of an Eighth Amendment violation. We think so, too, as to Mr. Smith. And we think that the treatment of Mr. Miller constitutes a violation of the protocol. The department does not seem to think so. So even with the order of the district court, Mr. Smith is still subject to the same treatment that Mr. Miller was subjected to. And we believe that that would constitute an intolerable risk of a violation of the Eighth Amendment. Oh, go ahead. I'd like you to finish. The second reason that we think the order is not sufficient is that it depends on self-reporting. And what I mean by that is that the process for establishing intravenous access occurs behind a drawn curtain in the execution chamber with no public observation, and the only witnesses are the condemned inmate and ADOC personnel. The condemned inmate is not expected to survive as a witness to the event, and the ADOC personnel are not even identified. So there is no way for the district court to enforce its order because there's really no way to know precisely what happened in the execution chamber while the curtains are drawn. Do you have any suggestions for how that order could be enforced or what steps? Let's say, which I know you're not conceding, but let's say that you did think that if that order were followed, there wouldn't be a problem. Is there anything that you think we could do or the district court could do to ensure that that order would be followed? Your Honor, I think it's difficult to say without any discovery into what went on during Mr. James' execution and Mr. Miller's execution so that we understand the problem and have a basis to make recommendations to fix it. It seems like you've made pretty specific allegations about what you think went wrong. I don't know that I read that as being a problem. More that you think that if that happened here, too, that would be a problem. We think that if Mr. Smith is subjected to the same treatment as Mr. Miller or Mr. James, that that would be a problem. But the problem with the district court's order is that this is all going to be going on in the execution chamber behind a drawn curtain with no one observing and with no means for Mr. Smith to communicate with anyone outside the execution chamber and allege that the order is being violated. And even if there were a means to communicate or someone were observing, I'm fairly confident that the department and Mr. Smith's representatives would have a dispute over whether what was occurring was a deviation from the protocol. Well, I guess that's why I want to make sure I'm understanding your argument. Is your argument that even under the protocol, even if the protocol is strictly followed, there could be a problem or that without supervision or enforceability, the protocol is sure to be violated and there's no way for the court to know that or to hold the state accountable if that's what happens? Your Honor, I'm not saying that it's sure it would be violated, but I'm saying that there's no means to, certainly in real time, to know whether it is and to have the judge enforce the order before it was violated and there was an Eighth Amendment issue. But what about the first part? If the protocol were followed, then it wouldn't be a problem, right? Your Honor, we have a dispute over whether the protocol is being followed, and maybe I can try and explain what that dispute is. Because the protocol itself specifies two potential methods for establishing intravenous access. First method is called the so-called standard method. And then there's a backup method that's permitted, which is a central line procedure. And in our view, and we have alleged and we have, in addition, we've attached declarations from medical doctors that support the allegation, it shouldn't take three hours, as it did in Mr. James' case, or nearly two hours, as it did in Mr. Miller's case, to either establish intravenous access by the so-called standard procedure or determine that it's not reasonably possible. But both in Mr. James' case and in Mr. Miller's case, the department seems to take the view that they can just jag away in the hopes that they'll finally hit a vein. Do you think that that's conceit? Let's suppose that that is wrong and problematic, right? But do you think that's also a violation of the protocol? Or is that something wrong and problematic that is permitted by the protocol? We think it's a violation of the protocol, Your Honor, because it's neither the standard procedure nor a central line procedure, which the department never even attempted with either Mr. James or Mr. Miller. So we think the standard procedure, at some point, there's got to be a determination that we can't do that with this inmate. And if that's the case, you either move on to the central procedure or you stop. We don't think that the standard procedure contemplates an open-ended period of potentially, if the execution starts at 6 p.m., a six-hour period where two or more people in medical scrubs, if you accept Mr. Miller's allegations about what occurred during his attempted execution, stand over him, do a tour of his body, poke and jab, and it's sometimes simultaneously poke and jab him. That's not the standard procedure. There is often a comparison to a medical setting where, of course, establishing intravenous access is often necessary. And in a medical setting, if the standard procedure didn't work and the standard procedure, as we understand it, is sliding a catheter into a peripheral vein, if that is unusually difficult with a particular patient, you would move on to other procedures. It would escalate. Maybe you would use ultrasound to locate a vein in the patient's arm. But as it's applied by the department, there is no moving on. It's just viewed as a potentially six-hour period where they can keep poking and jabbing and drawing blood and doing all sorts of other things to these inmates. And if you accept, again, Mr. Miller's allegations, they ignore his questions about what's going on, ignore his entreaties about the pain that this is causing him. In his own firsthand account, he describes excruciating pain and psychological trauma. And we contend that there's an intolerable risk that Mr. Smith, if his execution goes forward in some 28 hours, will be subjected to the same treatment. And we contend it violates the Eighth Amendment. So it sounds to me like you're saying that the problem may be that the protocol isn't specific enough. Either that or that the way in which the department implements the protocol is problematic. So it's not just a failure to enforce. Am I reading that correctly? No, you're reading it correctly, Judge Pryor. We think that the protocol as implemented by the department creates a problem. And that is something that we discovered or only could discover with the execution of Mr. James on July 28th. And that's why we filed, only three weeks after that, we filed a complaint alleging that there was an intolerable risk that Mr. Smith would be subjected to the same treatment as Mr. James. So in your, if I could draw your attention to your proposed amendment complaint, amended complaint in paragraph 105, you say as ADOC implements it, referring to the protocol, it authorizes ADOC to use other procedures at its discretion. Is that what you've just been referring to?  And we further contend that the district court erred in dismissing our complaint without access to discovery of the procedures that have been going on in with respect to Mr. James and Mr. Miller's executions. That information is in the sole possession of the department. We, the district court, with respect to our allegations concerning Mr. James, said that we did not provide sufficient detail about the severity and the duration of pain that Mr. James experienced. Well, we have, Mr. James is not available as a witness to that. The ADOC representatives who performed these procedures and who observed them are not available to us because they were not identified. And so we think we were, the district court held us to an improper standard at the pleading stage. And what we did plead was sufficient to raise a reasonable inference that Mr. James suffered severe pain and violation of his Eighth Amendment rights. If I may interrupt you. Speaking only for myself, I read your complaint, and please correct me if there's a paragraph I'm missing, but to focus on the fact that ADOC's lethal injection protocol is entirely advisory, meaning executions are being carried out by individuals who are either unable or unwilling to follow the protocol. Instead, once ADOC is given permission to begin an execution, it will not stop until the death warrant expires, even when those efforts go beyond the protocol and cross the threshold into torture, cruelty, or substantial pain. And that was paragraph 10. And another, paragraph 12, refers to more protocol violations are likely to occur. 13 says lethal injection protocol is only advisory. 25 says once an execution begins, ADOC reserves the right to deviate from the protocol to establish intravenous access. 26-46 allege material deviation from the protocol during James' execution. And then 47-56 allege material deviation from the protocol during the attempted execution of Miller. And 72 says there's no way for a condemned person to know that the protocol is only advisory until the James and Miller events. It seems to me that what you pleaded is that Alabama would go beyond the protocol or wouldn't enforce the protocol, rather than even if they follow the protocol, my client is going to have, is going to experience conduct that would violate the Eighth Amendment. Can you tell me whether there are paragraphs that I missed that make the allegation that I think you're focusing on here? No, Your Honor, I think you're correct in your reading of the complaint. Our position is that the Department deviates from the protocol in establishing intravenous, specifically in the means for establishing intravenous access preceding the administration of the lethal drug cocktail. And that that was demonstrated by first in Mr. James' execution and next in Mr. Miller's attempted execution. And that the problem is that they do not limit themselves to the standard procedure or central line procedure. And as I've said earlier, they didn't even attempt the central line procedures, far as we know, in either execution. But what they've been doing, poking and jabbing for hours on end, is not the standard procedure. And that violates the Eighth Amendment, that there's an intolerable risk that Mr. Smith will be subjected to the same treatment. And we've pleaded allegations, both specific to Mr. Smith and more general, about why he specifically is at risk of this. We've pleaded allegations that he is borderline obese. We've pleaded allegations regarding medicines. He was recently prescribed to treat depression and insomnia. And we've treated allegations, excuse me, Your Honor, we've pleaded allegations about the difference between attempting to establish intravenous access in a medical setting versus attempting to do it in a prison setting during an execution. All of which... So if you could, and I understand your different argument that you can't, right? But if you could guarantee that the state would follow its protocol, then that would be responsive to the allegations in your complaint, wouldn't it? Your Honor, it would if we agreed on what a deviation of the protocol was. If the department agrees with our definition of a deviation from the protocol, that might address the problem. But as far as we can tell, anyhow, they don't. Is it the deviation from the protocol or a more detailed protocol? Well, Your Honor, as we said in the district court, we don't discount the possibility that the protocol could be amended in a way that would make it compliant with the Eighth Amendment. But again, we think that that would require discovery into exactly what's been going on so that there could be some assessment of whether the amendments fix the problem. And we think as things stand now, it's all a black hole. No one really... I shouldn't say no one knows what goes on behind the drawn curtain. Some people know. They're personnel of the department, but they're not identified. And after the execution, including Mr. Miller and Mr. James, when the commissioner holds a press conference, there's not an admission that something unusual or untoward went on. There's nothing to see here. I don't necessarily have a disagreement with you there. I'm sure we'll all have questions for opposing counsel about that. But did you have any pleadings about disagreements about what fell within the protocol or a need to amend the protocol to address your concerns? We had no pleadings about amending the protocol to address our concerns. This was raised very briefly at the oral argument before the district court on October 13th. In terms of pleadings, I would say that what establishes that there's a disagreement about what deviates from the protocol is that we allege that the treatment of Mr. Miller deviated from the protocol. As far as I'm aware, the department does not. In fact, I think they've said in their papers that they deny that that's the case. And so we if if tomorrow Mr. Smith is subject to execution and we at least hope he's not, but but if he is, then it seems to us that the department will feel free to do. To engage in the same conduct that it did with respect to Mr. Miller and with respect to Mr. James, at least as far as the department is concerned, they're not going to report to Judge Huffaker that there was any deviation from the protocol. And we're not going to know because we're not going to be in a position to see exactly what happened. All we'll potentially know is the amount of time between 6 p.m. and whenever the curtains open. And so that I think is the fundamental problem from our view with the court's order. And we don't we're not suggesting that the district court is not sincere and determined in the order that it issued and in enforcing the order. But we just think that as a practical matter, in light of the fact that we don't agree on what a deviation is and that it's entirely subject to self-reporting, that the order does not provide us the relief that we think we need to ensure that Mr. Smith is not subject to a treatment that violates the Eighth Amendment. What relief are you seeking from this court? Because you styled your motion as a motion to stay. You haven't asked for a motion to stay execution. You've asked for a motion to stay execution pending the outcome of your appeal on the denial of your... With the time limits, it's a burden on the parties and a burden on the court. But we don't want 6 p.m. tomorrow to arrive. If the panel needs more time to resolve the appeal, we don't want the appeal to be mooted by an execution tomorrow evening. So if we were to rule on the merits, which would moot your motion for a stay pending appeal, what would you do? Your Honor, in that case, we are prepared to file a preliminary injunction motion in the district court with a motion for a stay of execution in the district court pending disposition of the preliminary injunction motion. Thank you. All right. Thank you, Mr. Grass. Thank you. Okay. And Mr. Wilson? May it please the court.  I'll begin with Mr. Smith's Eighth Amendment claim and then proceed to his liberty interest that he asserts under the Fourteenth Amendment. Smith's claim that ADOC, quote, deviates from the protocol to do anything necessary to establish IV access fails for three reasons. First, he fails to state a plausible Eighth Amendment claim. Second, the claim is moot. Third, the claim is also barred under the two-year statute of limitations. I'll begin with the plausibility issue. Now, you just heard my friend on the other side repeatedly discuss his view that the ADOC violates the protocol, but he does very little to engage the primary issue in this litigation, which is the merits of whether ADOC violates the federal constitution. He cannot show this. Under Bayes and Glossop, he has to make two showings to prove his claim or even to plead a claim. He needs to show that the ADOC's protocol or violations of the ADOC protocol that he alleges, quote, super adds pain well beyond what is necessary to carry out the execution. And second, even more straightforwardly in this case, he can't provide a viable blueprint showing that nitrogen hypoxia is a viable alternative. Indeed, in this very litigation, he asserts that it's not available. And he and his expert expressly declined to explain how it might be used in testifying that the way nitrogen hypoxia might work in an execution, quote, remains unknown. Now, in this case, the ADOC's previous actions violated the Eighth Amendment by, in the Bucklew Court's words, super adding pain well beyond what's needed to effectuate a death sentence. In Bucklew, the Supreme Court made clear that the Eighth Amendment does not demand the avoidance of all risk of pain in carrying out executions. The court ruled that the constitutional methods of execution, such as hanging, often did not result in quick or remotely painless deaths. Do you think that a cut-down procedure fits within the protocol? I think that what we've agreed to is that the protocol does not expressly permit a cut-down procedure. And we've agreed that we will not, that ADOC will not perform a cut-down procedure, Your Honor. And what about an extended period of time poking or prodding the convicted? Yes, Your Honor. I'm glad that you brought that up. The extended period of time issue is sort of an interesting one, I think, and particularly based on Smith's own expert's pleadings. Now, Smith claims that we are taking too long, says that two or three hours is simply too long to establish IV access. Now, critically, what he relies on for this is his declaration from Dr. Zivit. The comparison that you just heard him make and that Dr. Zivit makes is to establish medical settings. Dr. Zivit compares ADOC to Emory University hospital system. Now, the problem with this is that in Dr. Zivit's own declaration and particularly in Dr. Young's declarations, both of them explain that in non-optimized situations, such as where a prisoner or the recipient of the IV is under substantial stress, anxious, exactly the sorts of situations you would expect from a lethal injection, a lot of difficulties can occur in trying to establish IV access. Dr. Young, Mr. Smith's own expert, says that in 35 to 50 percent of regular IV attempts, they're going to fail. So if we are expecting two IV lines to be established in an inmate with a 50 percent risk of error in regular IV access, it's only heightened when the inmate is anxious or upset as one might expect with a lethal injection. You expect to see multiple punctures. Three hours? I mean, does the protocol specify how long the execution team can attempt to access a vein before moving to a central line? Does it say anything about how long you can do it? I mean, can you do it six hours? I'm sorry. Six hours, you said? What I'm asking is, does the protocol specify how long you can jab until you find a vein? The protocol does not specify how long one can search for a vein. I would note, Your Honor, that Mr. Smith and his experts never actually say how long this should have taken. They never say how many punctures should have occurred. What they say is three hours, which is what has happened in the last two allegedly botched executions. It's too long. They do say that, Your Honor, and I think what's critical is to then look at why they say that. So they say that based on Dr. Zivit's statement that he would not expect. I think his quote is, it would be highly unusual. And his narrative, I would say, again, refers to Henry University, where patients are willingly receiving IVs. Why isn't that enough to plausibly allege an Eighth Amendment violation? It doesn't come close to an Eighth Amendment violation, Your Honor, because under the Eighth Amendment, he would have to show that the state's procedure is super adding pain well beyond what's needed to effectuate a death sentence. He hasn't even explained how much pain is necessary to establish the IV lines in the situations that he's describing. After hours, why wouldn't the team move on to the secondary, the central line procedure? Your Honor, I can't answer exactly what their medical decision making was. I will note that Dr. Yang's declaration states that it's not only more difficult, there are more errors trying to establish an IV in what he refers to as non-optimized conditions, but that recognizing those failures can also take substantially longer. These are his own pleadings. So I would expect that in a situation where the prisoner is anxious and, in Dr. Yang's words, non-optimized, it might take longer than usual, certainly longer than a willing blood donor at Emory University Hospital to establish the IV line. And in Dr. Yang's explanation, it would take longer for the ADOC staff to notice that the line hadn't actually properly been administered. Go ahead. We could determine all that through discovery, though, couldn't we? Determine all? I mean, how long should it take? Three hours too long before you're able to poke all around? Your Honor, I think he's already put himself out of that. His own experts are explaining that we would expect there to be multiple puncture wounds, that we would expect this process to take a long time. He invites this court to imagine a situation in which rogue ADOC staffers are going in and just blindly poking and prodding. I think my friend referred to stabbing. What if it's not rogue, though? Because we don't know anything at all about the qualifications of the people performing these procedures. And frankly, if you invited me in, even if I had every intention of carrying out the protocol to a T, it would be a very bad situation, right? I have no training, et cetera, et cetera. So how are we to know anything about whether the people who are performing these procedures are qualified to do it? I think that what he has to first show before getting any sort of discovery into the state's own confidential information is that he's alleged a violation of the Eighth Amendment. And again, he can't do that. His own experts make it clear that the exact protocols that he's referring to with James and Miller would have fallen well within their own expectations. Dr. Young says a non-optimized patient is going to take a long time. We don't know exactly how long. But critically, that's because they're not telling us. Dr. Zivit could have said, here are how many punctures that James had. He could have said he decided not to. So we don't know how many punctures would be within the constitutional realm. And we can't evaluate the delta of what is, therefore, unnecessary or going beyond that constitutional realm because it hasn't shown us. Did Mr. Smith ever request the government autopsy of James in discovery? I can't answer that, Your Honor. I'm not sure. I'll let my friend sort the government's own autopsy report. I know that based on the autopsy that Dr. Gatnow conducted, they received that but then decided to hire Dr. Zivit for a reason that remains unclear. So for the same reasons that Dr. Zivit's declarations failed in Buckley v. Presythe, they do so again here. That is, Dr. Zivit never actually explains the quantum of harm that he considers to be unnecessary. And thus, he provides no support for Smith's claim that ADOC's protocol subjects him to unnecessary suffering. And related, even if his allegations about James' execution and Miller's attempted execution did amount to cruel super addition of pain, Smith has failed to show that he will have the same experience. Now, Smith makes little effort to suggest that he's similarly situated to James. Well, isn't his argument that what happened in the two previous executions form a pattern that make it more likely to happen with him? And I feel like in responding to that argument, you separated out the two executions rather than viewing it as a pattern, which is how I view the allegations of the complaint. Your Honor, I think that he has expressly tried to tie himself to Mr. Miller, at least, by explaining that he is borderline obese. Now, to be clear, he's 5'10", 207 pounds. That's Dr. Zivit's declaration. Borderline obesity is not the same as Alan Eugene Miller, who's the same height, 5'10", and 351 pounds. He is the one who's attempting to tie himself to Mr. Miller to show that there's a likelihood of him facing these same issues because he acknowledges that some of Mr. Miller's issues were a product of him being 5'10", 350 pounds. I want to go back to Judge Grant's question where she was asking about how do we know the qualifications of the people on the team. And Dr. Zivit's declaration does go to that in paragraph 14, where he talks about an unidentified execution team is unlikely to have the training experience necessary. And specifically, he points to, quote, the unidentified person who slapped Miller's neck to establish a central line. Zivit advises that veins cannot be brought to the surface by agitating the skin, and a person who slaps the skin to bring forth a vein lacks the skills and knowledge of how to place a neck central line. So, I mean, there are more specific allegations. Your Honor, I think that I would agree that there are more specific allegations. But, again, slapping the neck of the skin is not going to rise to cruel super addition of pain, particularly when it appears to have been done in a medical setting, and even if it was, not within Dr. Zivit's judgment of the best way to establish intravenous access. If I may, Your Honor, I'll address now Bayes-Glossop test's second prong, which is even more straightforward here. State has not properly shown a feasible and readily implemented alternative method of execution. Are we supposed to assume that the Alabama legislature and the governor chose a secondary form of execution, that when they agree with the defendant, that we're going to decide that that's not appropriate? Sorry. Sorry, I could have asked that question much more clearly. Essentially, by the time the state, in a recent era, the duly elected representatives of the state conclude that this would be an effective method of execution, and so does the convicted person. Where does the Supreme Court tell us that we can step in and disagree with that? Doesn't that seem like a stretch to you? Well, Your Honor, I think that we would want to look at exactly what the state, the governor, or the people of the state actually said. And if you look at subsection I of that law, they clearly contemplate that nitrogen hypoxia might not be available. And they say, at no point will a prisoner's election of nitrogen hypoxia supersede the methods of execution that are available. That seems a little unfair, honestly. You set out this new method, and then you say, but you can't use it, because we don't really know if we're going to do it. I mean, I think one reason that chemical was chosen is that it's readily available for reasons unrelated to death, which means that some of the European boycotts won't affect it, et cetera, et cetera. I mean, that doesn't seem quite fair to me. Well, I think that there's a difference between determining what might be theoretically available and determining what's available in fact. And I think that what's interesting about this litigation is that Smith is simultaneously arguing that as a matter of theory, nitrogen hypoxia is available. And then at the same time explaining that as a matter of fact, it's not. His own expert, Dr. Zivit, explained that he has no idea how to execute someone with nitrogen hypoxia. So as a matter of fact, I think that we're in a situation where he cannot show a viable alternative method of execution. And his entire litigation strategy depends on him never making that showing. He never plans to show it. This is not just a pleading issue. It's a litigation strategy issue. And I think it's worth pausing for a moment to think about how we got to a place where a litigant can simultaneously assert that nitrogen hypoxia is both available as a matter of law and unavailable as a matter of fact. So how can Smith, with a straight face, say that he's shown a plausible, feasible alternative when his own expert says that it's not available? But isn't Alabama making the same argument? It's available as a matter of law, but it's not available as a matter of fact. I mean, that's actually the same argument. Respectfully, Your Honor, I don't think that it is. I think that the argument that the state is putting forward is we never declared it sort of evergreen, available, come hell or high water as a matter of law. We expressly, in that law, stated that it might not be available and that its unavailability would not supersede the execution. And now what my friend on the other side tries to do is say that, well, in Price v. Dunn, there's this language that suggests that nitrogen hypoxia is available as a matter of law. But that argument isn't brief. It fails for several reasons. First and most fundamentally, the language can't be squared with what the Supreme Court said just five months ago in Nance v. Ward. How can you say it's unavailable when you've given inmates the opportunity to choose that method of execution? Because, Your Honor, we've given them the opportunity to choose that method of execution if that method of execution is available as a matter of fact. And what we're saying here is that it's not available as a matter of fact. And this type of litigation is what directly contravenes the Supreme Court's statement from just five months ago. Now, again, Your Honor, in Nance, the Supreme Court said the only way that a litigant can bring a Section 1983 method of execution, which is exactly what Smith is bringing here, is if he provides a veritable blueprint showing how his execution can still proceed. Now, the reason for that is that without that veritable blueprint, we're in a habeas world. We're at, I believe, in terms of the fundamental core of federal habeas corpus. But in Oklahoma, there was no other method of execution provided for by statute, right? And so you're referring to Glossip? Sorry, I'm going to say my states. But there was no other statutory method of execution, correct? I'm not sure, Your Honor. Isn't that relevant? Well, I think it would be relevant if the statute, again, if it guaranteed an everlasting matter, as a matter of fact, the state is ready and willing and always able to provide this method of execution. On its face, the law never did that. So, again, I think that he doesn't actually suggest that he can ever show how nitrogen hypoxia is to be administered. He is never going to come forward with a veritable blueprint that the Nance court echoed from the Bucklew court. Isn't it entirely within the department's control whether or not nitrogen hypoxia is available? I'm not sure that's in the record, who's in control of nitrogen hypoxia. Well, my point is the legislature passes a law that says make that available, let inmates choose, and then the department doesn't make it available. It seems to me a little atrocious that you're now invoking that as a defense to say there's no other method available. Your Honor, I think the legislature has passed other laws suggesting a certain chemical compound for a lethal injection, and then just as a matter of fact, those have not been available. I think that we're facing a similar situation here. So is this essentially a mass commutation of sentences by the Alabama legislature for any inmates who, as the law provided, elected nitrogen hypoxia for their method of execution? No, Your Honor, I don't think this is a commutation of any sentence because, again, under the law... If it's not available, then isn't that just giving all those people life in prison effectively? I don't think that that's correct, Your Honor, because if it's ultimately decided that it's not going to be available, then election of that method of execution is, by the statute, not going to supersede the facts on the ground, and so they will still face their execution. So, because Smith has failed to plead any super-added harm that goes well beyond what's necessary to execute him, and because Smith fails to show and has no intention of ever showing that nitrogen hypoxia is readily available, he's failed to plead a viable Eighth Amendment method of execution claim under Section 1983. Now, if I may, I'll touch briefly on mootness and statute of limitations. Turning to mootness, Smith argues that while the risks of a cut-down or intramuscular sedation might be moot, ADOC is not sworn to not spend two hours, quote, continually jabbing him in the hopes of hitting a vein. And now, Your Honor, when we received Smith's first complaint, which he described as hinging heavily on Mr. James' execution and the alleged cut-down or intramuscular sedation, we, in good faith, tried to accommodate, and we said, okay, we don't necessarily agree that that's actually what happened, nor do we agree that that would have been a violation of the Eighth Amendment, but we're going to moot that out. We are going to guarantee that what you allege happened to Mr. James is not going to happen. But his claims now have changed. He's saying, no, it's not just the intramuscular sedation. It's not just this cut-down that we were initially hanging our complaint on. It's now continually jabbing for hours. But, Your Honor, as discussed earlier, referring to Dr. Zivit and Dr. Young's testimony, there's just, or excuse me, their declarations, there's just no evidence that the State is continually jabbing anyone. You argue that the claims are moot because the district court has ordered that the protocol be followed. How can that order, in response to Mr. Green's arguments, how can that order be enforced if there's no one in the chamber to say what's happening? Well, thank you, Your Honor. I think what's interesting about Mr. Smith's argument is he says that it can't be enforced because we'll never know what happened. But his claims rely on us being able to know what happened through autopsies. Now, Judge Huffaker has been very, very explicit about this. He says there will be criminal sanctions if the protocol is violated, if there is intramuscular sedation, if there is a cut-down. Well, that doesn't help Mr. Smith. You respect what you're doing. I think it does because I think the ADOT employees generally don't want to face criminal liability. But, I mean, he'll be executed. I mean, the State might be subject to sanctions if it violates the court's order. But Mr. Smith will not be here. So I agree, Your Honor, and I agree, of course, that death is final. I will note, though, that the Supreme Court in Bucklew has explained that the Constitution does not guarantee an execution that is risk-free, that is going to have no risk of pain. So we know that. I mean, it guarantees a death that will not be unusually torturous or cruel. Cruel and unusual. Exactly. Which doesn't guarantee a risk-free death. And so if we know that there's some element of risk inherent in execution, then we also know that even though I completely agree Mr. Smith's death is a final event for Mr. Smith, we know that there's some level of risk that the Constitution permits with that. So Mr. Smith's job in this litigation was to show that that quantum of risk was so substantial that it will violate the Eighth Amendment, that it violates his Eighth Amendment rights. And he can't do that. And again, Your Honor, part of the reason is, as we just talked about, there are potential criminal sanctions for ADOC employees on the line. They don't want to face those. Those are very serious. I can represent that we have discussed this with them. Judge Hofegger has been incredibly clear, and we are following his order to a T. So the argument is that the explicit threat of criminal sanction is enough to mitigate the risk that ADOC employees will do something beyond the protocol that is harmful to Mr. Smith during his – I mean, harmful in a different way than it's supposed to be harmful to Mr. Smith during his execution. Is that right? So, Your Honor, I think that if that – if one of the criminal sanctions directly from a judge can't moot bad government behavior, then nothing can. Yes, Your Honor. What about the – this is an unusual situation, given the secrecy surrounding what happens in that room before the curtain is pulled, right? I think the secrecy is actually – My point is, it's not like other criminal sanctions, which could presumably be easily verified. I'm not sure that I can speculate about that, Your Honor. I think that my friend on the other side has tried to build his entire case on post hoc analysis of what happened. I guess at the most basic level, I think what Judge Pryor is getting at is how will the court know if its order is violated? Well, Your Honor, I presume that Mr. Smith's attorneys are going to be involved in analyzing his body and trying to figure out whether anything untoward happened and that they'll present evidence to Judge Huffaker and that he'll rule on the evidence that he sees, just as he's done with the evidence that they've already presented from previous autopsies. I take it you haven't offered any means of verification. You haven't invited anyone into the room, a court representative, anybody like that? No, there's serious security risks, and we're not intending to do that, and we have not offered to do that. So as for the statute of limitations, Your Honor, I will primarily rely on our briefing. But I do want to note that based on the shifting nature of Mr. James' claim, where he went from focusing on Joe Nathan James' alleged cutdowns in intramuscular sedation to a broader claim about taking too long and having too many punctures, Smith has bled himself out of court. On page 5 of his first complaint, he cites the execution of Doyle Lee Hamm. That execution provided almost the exact same facts that he alleges took place with James and Miller. There was a two and one half hour delay while ADOC staff attempted to establish, excuse me, to establish an intravenous line, during which time ADOC punctured Hamm at least 11 times. That was four and a half years ago. That was February 22, 2018. So for the statute of limitations not to have run over two and a half years ago, Smith would have to prove that he was justifiably ignorant of that development. That's a hurdle that he can't meet, given that the details of Doyle Lee Hamm's execution were well publicized. Indeed, in his complaint, he cites a contemporaneous news article publicizing exactly what he quotes, two and a half hour execution, 11 punctures. Now, he's been represented by some of the finest law firms in the world, one of the finest firms in Alabama, and a major international law firm. He has been their client this entire time. There is no good argument that they or he, therefore, did not know about this. But he's waited until now to present this claim. So unless there are further questions on the Eighth Amendment argument, Your Honor, I'll turn to his Fourteenth Amendment claims. What's the current Alabama policy with regard to having a minister in the execution chamber at the point of execution? I don't have that off the top of my head, Your Honor. I believe that we took that issue to the Supreme Court relatively recently, and that there is a minister permitted, but that hasn't been briefed. I haven't researched it, and I don't want to misrepresent anything, Your Honor. It doesn't have anything to do with this case, but you indicated that there's a security risk associated with having anyone other than those who are going to participate in the execution of the execution chamber, and that's why I asked that question. Understood, Your Honor. And I think that oftentimes the clergy who are in death chambers are actually prison clergy, so they've been pre-verified within the prison. But again, I haven't briefed this, and I want to misrepresent something to Your Honor. So unless there are further Eighth Amendment questions, I'll turn to Mr. Smith's Fourteenth Amendment claims. And I'll confess that like the district court, I've had trouble making sense of exactly what he's trying to argue here. He first seemed to say that he didn't have proper notice of the ability to elect nitrogen hypoxia. More recently, he suggests that he did have notice, but that what he really didn't know was that nitrogen hypoxia was not going to be available for a longer duration than he would have expected. I'm not sure I've seen any analogous Fourteenth Amendment argument made before. He certainly doesn't cite any precedent to support this kind of claim. And that information also wasn't available to the state. He hasn't established a procedural right to notice. In fact, he seems to concede that there's no procedural right to notice for the law itself. And yet he claims that there's a procedural right to notice of things that happened four years in the future that the state itself didn't know. I think that claim is self-refuting. As to the statute of limitations, on page 45 of Mr. Smith's opening brief, he explains that it would have accrued when the state knew that there was no nitrogen hypoxia available. As explained in the state's response brief at the latest, that should have been with Jared Taylor's pending execution in August 2019, where the state publicly announced that nitrogen hypoxia was not going to be available. Again, Mr. Smith has world-class counsel. Undoubtedly, they have been protecting their clients' rights. It would pass strange for them to suggest that they weren't aware of that development. Finally, in the remaining time, I'll note that to receive the injunction that he seeks, Smith has failed to meet all four of the PI factors. That is a substantial likelihood of success on the merits, of course, because he hasn't actually pledged, excuse me, he hasn't actually pledged a lawful claim. I think he told us he wasn't seeking an injunction here. Do you agree with that? I thought I understood his counsel to be saying that he would, if we agreed with him on his claim here, would then seek an injunction from the district court. Your Honor, I did hear him say that. My understanding was that he also filed an emergency motion for an injunction in this court directly, which was what I was responding to. He was asking this court, as this court knows to be a fact finder in the first instance on the equities. The reason for that is probably because the district court would have found that the equities cut against him because they do, and then this court would have reviewed them on clear error. That's gamesmanship, and this court shouldn't reward it. Thank you for your time. All right. Mr. Grassley, you've reserved some time for rebuttal. Just a few quick points, Your Honor. First, with respect to whether we have pled a plausible violation of the Eighth Amendment, I would refer to Judge Huffaker's claim in Mr. Miller's case, which was issued just a few weeks ago, where Judge Huffaker determined that Mr. Miller's allegations of being poked repeatedly for nearly three hours do state a plausible allegation of an Eighth Amendment violation, and I'll read the relevant portion of Judge Huffaker's decision. May I actually ask you a question, since I know your time is limited? Do you think that that finding sets any standard for the Department of Corrections individuals who are carrying out the execution, such that they would understand that taking two or three hours to find a vein would be a violation that they could be held accountable for? No, Your Honor. They made the motion to dismiss in the Miller case, and they apparently disagree with Judge Huffaker's take on this. But isn't his take now the take? Well, it's the take released in Judge Huffaker's court. Your Honors may one day have something to say about that, for sure. But what he said was at this stage, given Miller's allegations, which must be accepted as true, that he suffered extreme physical and psychological pain during and after the first execution attempt, that the defendants have not undertaken any review of what occurred or how to avoid a similar situation with Miller in the future, and that Miller identifies a feasible and readily implemented alternative execution method, nitrogen hypoxia, that would significantly reduce the risk of pain by avoiding the use of needles entirely, Miller has plausibly alleged that a second lethal injection execution cruelly super-adds pain. And so we do think there's support for the proposition that we also have plausibly alleged a violation of the Eighth Amendment. Now, as for a feasible alternative method of execution, again, Judge Huffaker, as what I just read, suggested, and also in our own case, concluded that alleging nitrogen hypoxia as a feasible alternative method of execution is sufficient at the pleading stage. And he did so, citing this Court's decision in Price, 950 at 1317. I believe Judge Wilson was on the panel there. The Court spent three pages going through the very arguments that the defendant here is making for suggesting that nitrogen hypoxia is not a feasible and available alternative, at least as a matter of law, and the Court rejected them. I won't be so presumptuous as to suggest to the Court what portions of its decisions it should describe as dicta and what it should describe as holdings. But I will say two things about Price. First, neither Price nor Bucklew nor Nance are addressing the sufficiency of pleadings. They are not establishing a pleading standard. Secondly, if your honors are inclined to announce that what Price said over three pages about this was dicta, we respectfully suggest that we were entitled to rely on Price as a pleading matter and that we should not be kicked out of court for doing so. Next, I'd like to address what was said about Dr. Young and Dr. Zivat and the proportion of IV attempts that fail, even in a medical setting. But the point is, if the IV attempts fail in a medical setting, they just don't keep poking and jabbing someone for three hours, two hours, six hours. They have other procedures to access the thing. And so, that is why discovery in this case is critical. I meant to ask you, did you request the government autopsy report for Mr. James? I see my time has expired. My answer... You can answer the question. Thank you. Yes, Your Honor. We did a service discovery request on October 10th, maybe. And we also sought expedited discovery and we asked the judge to establish a scheduling order for our anticipated preliminary injunction motion, which ended up being mooted when the judge dismissed our complaint. And so that we're clear, counsel, all we have before us is Smith's motion for stay of execution pending appeal. Right? That's correct, Your Honor. Okay. All right. All right. Thank you, Your Honor. Okay. It is in recess until 9 o'clock tomorrow morning. All right. Thank you.